Case No. 251638 Fetch Pet Care Inc v. Atomic Pawz Inc et al. Argument not to exceed 15 minutes per second. Mr. Conner, you may proceed. May it please the Court, Christopher Conner, I'd like to reserve three minutes for rebuttal. You may. I represent Fetch Pet Care, Inc., a national franchisor of pet care and house-sitting services. And pertinent to my first point, they also have a number of registered trademarks. I'd like to first address the Court below's misapprehension of this Court's decision in performance unlimited. Then I'll shift to unclean hands and conclude with first material breach, explaining exactly what happened in May of 2025 that led to this litigation. Your Honors, we prevailed in the Court below on our Lanham Act claims. In fact, there was no defense presented. The Court below specifically found that the appellee's inclusion of Fetch reviews on their new business's Google review pages would create a likelihood of confusion because it would give a sense of affiliation with Fetch that no longer existed. Classic Lanham Act proof. But the Court denied injunctive relief, and this is its reasoning. It said that an injunction would harm the infringers financially and potentially reduce Fetch's recovery in the pending arbitration. I think the Court is aware there's a pending arbitration in this matter. In other words, that it was in our best interest to allow the infringement to continue in order to maximize our recovery, potential recovery in arbitration. Respectfully, Your Honor, we did not bring this action or seek enforcement of our trademark rights and seek an injunction to maximize our profit in the arbitration. I think the Court's rationale is simply unsupportable. And I respectfully submit that the Court stumbles here because of its misapprehension and misapplication of this Court's decision in performance unlimited. The Court below stated this Court's holding to be as follows. In claims subject to arbitration, an injunction is only warranted where the injury is of such significance that it threatens the entirety of the plaintiff's business. Of course, that's not what performance unlimited held. Performance unlimited followed a long line of sister circuit cases which said that when there's a pending arbitration, a district court has the authority to enter an injunction provided that the prerequisites for injunctive relief are met. I might agree with you on the understanding of the irreparable injury in our prior case, but if the unclean hands argument is good, is valid, wouldn't that independently suffice to eliminate an injunction, at least with respect to the Model 2 defendants? It certainly would, but I'll get to unclean hands. How does unclean hands, because I don't even view unclean hands as a merits. The district court relied almost like it's a likelihood of success, but it seems to me it's part of the remedy. It's just whether to grant an injunction is like always equitable. And so it has nothing to do with the merits and the arbitration. It's just more about whether an injunction is appropriate for the defendant's violations based on the plaintiff's own alleged misdeeds. Well, Your Honor, the specific holding on unclean hands was that the court found sufficient evidence of unclean hands on the part of the plaintiff by aggressively recruiting 2.0 franchisees while obscuring from them the true and full nature of the business and expected financial performance. Your Honor, this is a highly regulated industry, the franchise industry. This is the financial franchise disclosure document, the FDD. But the court made no factual finding, which is required under this court's decision in performance unlimited. You have to make factual findings of an unconscionable act, an egregious act. But there were no factual findings of disclosure violations. There was no finding of hidden fees, something that was not said. It was basically a misrepresentation of performance. And this court knows well that all franchise agreements are replete with warnings that there's no guarantee of success. There's no absolute result that can take place. FETCH wants their franchisees to succeed, but we're not a guarantor of that success. It would be counterintuitive for us to say, let's sell all of these franchises, dilute the brand and have all of them fail. That would make no sense. That's not what we were in the business to do and are in the business to do. I agree that it's abuse of discretion review on the point, and so it's a deferential standard. And there were some findings of kind of bad faith misrepresentations of revenue generated by Model 1 franchises. Being lumped together to Model 2 franchises, and there's some evidentiary basis for that. Anecdotal, I would submit, Your Honor. I agree there is some in the record. I concede that. But he took a lot of that testimony out of context. The one main video of Mr. Long touting up to $900,000 in revenues. And by the way, there is a FETCH 1.0 franchisee who does $1 million annually. This is not a business where you cannot make a substantial profit. But that was taken out of context. That was directed to, and the court missed this, that was directed to brokers. Folks who get leads for potential franchisees, and then it's up to the franchisor to convert them into a broker. So that's a separate and distinct presentation that was made just to get the brokers psyched up about maybe working with us and getting us some leads. Your Honor, the court's failure to make factual findings of a disclosure violation or some egregious act makes it guilty of what this court warned about in Performance Unlimited. And that is a loose cannon. It becomes a loose cannon. That's exactly what happened in this case. I also want to point out, when I said we were not the guarantors of a particular performance level or profitability, keep in mind what happened here and why this dispute is going on. COVID happened. COVID had a dramatic impact on the pet sitting and house sitting business. I don't think there's any debate about that. And what you have essentially here is a dispute based upon an organized group of franchisees who were disappointed in their profitability. And that, in part, is because the marketplace got hurt. And that goes directly to that issue of unclean hands. We promised, but we did not, we promised we would support each and every one of these franchisees. We did that. But without a finding of a disclosure violation, I don't believe the unclean hands defense applies. Can I ask you, are you disputing that you did not breach the contract or the state statutory laws when you shut them off, so to speak? Yes. Or are you saying their initial breach basically relieved you of the burden of the contract? Would it otherwise have been a breach, I guess, is the point? No. And I'll explain exactly what happened in May of 2025. I direct the court's attention to the record at page 6953. It's Heather Beer's testimony. She's the vice president of Fetch and responsible for the sales and marketing center. The difference between the two is that Heather Beer's testimony is that the difference between 1.0 and 2.0 is essentially the 2.0s have the benefit of the sales and marketing center, whereas the 1.0s have to hire their own personnel to do that. And I want to keep in mind on this Heather Beer testimony what transpired. In the spring of 2024, the association of these franchisees started. They hired counsel. They developed a legal fund. They began to act in concert. In the fall of 2024, they signed a class arbitration. Again, working in concert. Then forming all of the corporations necessary and entities necessary to transfer their business to new entities and leave the Fetch system. So while all of that happened, and with a well-financed and organized association, the association was able to do that. In May, what triggered the switch, Heather testified, is that the call center agents were receiving calls from Fetch clients who were receiving emails from unknown businesses to update their credit card information. That's on the record on page 6953. So the Fetch clients thought that the call center agents were receiving emails from unknown businesses to update their credit card information. So what happened was two of the appellees had already started their businesses. They moved their Fetch business to new entities, and those emails emanated from those new entities. So that's what triggered the investigation by Fetch. Fetch decided at that point, let's look at the MyFetch software system. They found the MyFetch software system that shows an existing Fetch franchisee teaching other Fetch franchisees how to steal the Fetch Google business reviews and move them to new entities surreptitiously. You add to that the draft letter setting forth a timetable for departure, and then comes the en masse download of confidential client data. Heather Beard testified that every single appellee who had access to the MyFetch software system exported an overwhelming amount of key proprietary client data. If they were planning to stay with Fetch, why would they undertake a group-wide download of this highly confidential data owned by Fetch and restricted by Fetch? To prevent further downloading, they shut down the system. I think that's a perfectly understandable reaction to these circumstances. Did you give them, was there any discussion about this? Did you confront them and say, why are you downloading this? We sent a warning out to say, you know, this is not okay. And the downloads continued. And you would think that there would be continued communications after the shutoff of communications, the shutoff of the Fetch system, and the shutdown of the MyFetch software system. Well, there was. And it came in the form of threats. The Fetch management had threats given to them by telephone, still under investigation to this day, to the point where it could be construed as death threats. And that led to the litigation. And that's why we are here. And those death threats were never mentioned by the court below. All right. Judge Gibbons? Aye. Okay. Thank you, counsel. We'll hear from the appellee. Good morning. May it please the court. My name is Brian Dillon. I represent the appellees and the franchisees in this matter. And just to clarify, the district court correctly denied this preliminary injunction motion. This case exemplifies why preliminary injunction relief is an extraordinary remedy. It's reserved for exceptional circumstances. And in this case, Fetch simply didn't meet its burden. And there were, as you mentioned, there were defenses that cut this off. The important part is the district court's decision rests on very sound factual findings. Well, can we start with the potential legal argument on irreparable harm? It does seem to me that it read our prior decision, performance unlimited, as setting an almost categorical rule that the plaintiff's business has to be at risk. The appellate is relying on just one sentence out of the entire ruling. And the court actually goes on beyond that. The court goes on to discuss the next year Auto Corp case versus Korea Delphi Auto Systems Corp. And it quotes, following performance unlimited, whether or not the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being. And next year has failed to show that loss, threatens its overall financial health to such a degree that it cannot be made whole with money damages. And the court goes on to quote, here plaintiff makes no, and this is the district court below, here plaintiff makes no showing that any injury rises to such level. And the district court... Setting aside what the district court did, would you just agree as an abstract matter that it would be wrong to require this demand in showing for irreparable harm? Yeah, no, I agree. And I don't think the district court actually held that standard, because it did go on to talk about the next year case and talked about the significance of the harm. And then it goes on to talk about how the harm that's occurred here is actually primarily all past harm. And the threat of future harm was really speculative at this point. Isn't that, I thought that was, to be honest, I thought the speculative nature of the harm from a non-compete is the reason why an injunction is granted, because damages are going to be hard to calculate. So it almost flipped the reason for the presumptive injunctions in non-compete cases on its head by relying on the speculative nature of the harm. Well, I think speculative and difficulty to establish are kind of two different things. But it's important to remember that the burden here is clear and convincing evidence that the harm is both imminent... I'm sorry, I'm interested in what you just said. Can you draw me the line between speculative and hard to calculate? To me, they seem like those two things merge in a case like this, but maybe there's a distinction I'm missing. I think hard to calculate just means you have to look at the numbers. And is it going to be this much or is it going to be this much? Speculative is, is it going to happen at all? So I think there is a distinction there. And the court went on to talk about how the harm was actually past. And what I was saying was it's important to remember that the burden here is clear and convincing evidence that the harm is both imminent and likely. I think that should be the standard. There's a Supreme Court case called Winter that just says it has to be likely. And there's no clear or convincing evidence component to it. Well, I believe that's Sixth Circuit. That just seemed to have been haphazard. But there's a later case, the Winter case, I think is what it's called. I may be mistaken the name. But I thought it was just a likeliness test rather than a clear and convincing evidence test. Why would we think it should be that high? Well, I believe that was Sixth Circuit precedent. Why does the precedent create that standard? Well, because you're asking for equitable relief here. You're asking, and in this case, to shut down franchisees, which will basically destroy their businesses. So I think there has to be a pretty high standard to be able to allow a court to issue an injunction in that case. But again, I think what really came to hear, looking at performance unlimited, the case was primarily looking at the balancing between the harm and also the effect it was going to have on the arbitration. And here the court said that granting the injunctive relief at this stage would actually fatally compromise the arbitration. But if you go back to this idea of the harm being passed, what the court really focused on was that when Fetch cut these franchisees off from its system, what it effectively had done was ceded those customers away. And it's important to remember, these customers, while contractually under their contract, Fetch says, hey, we own the customers, these customers are in contract with the franchisees. Fetch has no contract with them at all. So when Fetch cut them off, if these franchisees hadn't been prepared to actually continue operating, they would just be lost. If the non-compete was enforced, they would have a chance of getting the customers back. Well, the court specifically found that that is not the case. Your clients obviously would not get those customers, right? Correct. But the court also specifically found that Fetch would not be able to recover those customers either because they didn't have any relationship with the customers. That relationship had already been burned, so to say. So what that would be asking this court to do is overturn a factual finding that the court had already said. Fetch really had no ability to come in and take those customers or actually service those customers. And it's true. When you're in the pet sitting industry, these are loyal clients. They're loyal to these franchisees. They're not going to come just be with Fetch because its name is Fetch. That has very little to do with it. It's because they've built relationships with the pet sitter, with the person running the business. And the court understood that, and that was in the testimony and the evidence presented. Does Fetch actually provide pet sitting services, or does it only franchise the model and the name? It has corporate locations, too. But for the most part, they're all franchise locations. And where the franchise location is operating, they're the ones with the contract with the customer. They're the ones who provide the pet sitters. And none of these pet sitters were going to go work for Fetch. That was in the testimony and the evidence presented. So they've effectively seeded those customers, and the court looked at that and realized, well, at that point, Fetch has basically been harmed at that point. So any future harm at this point based on the goodwill or anything like that is essentially speculative and didn't rise to the level under the performance unlimited case. So that's how that would apply. Can I switch gears to unclean hands? So Fetch suggests it should be franchisee by franchisee, and that there's a kind of reliance interest that you have to prove, almost like a fraud claim. So what's wrong with that analysis? It seems like very few folks presented evidence, at least Model 2 franchisees presented evidence that they relied on this. Yes, I understand. And correct. But that's at the behest of Fetch. Fetch sued all 36 of these franchisees or franchises in one single case. It made it virtually impossible for that many franchisees to show up on three weeks notice. Why couldn't you have submitted an affidavit from them all? We tried that, and the district court said we had to do live testimony. So we were given two days of live testimony. That's not Fetch's fault. You should challenge the district court's determination that you can't have evidence. Well, I mean, from a practical standpoint, with that many people, it's just not going to be possible. You would be taking months and months to get to that, and Fetch wanted an immediate decision. In fact, we asked for more time at the beginning, and Fetch insisted on three weeks, and that's what we got. You think in the abstract, say one of your franchisees came up and testified. I actually knew about the difference between 2.0 and 1.0, and I knew this was all lumped together, and I still decided to do it anyways. Would he still be entitled to assert an unclean hands defense? I don't know the answer to that, but probably not. Who bears the burden of proof on unclean hands? Is it an affirmative defense? Well, the court correctly analyzed this under the case law that says when you're dealing with a preliminary injunction, it's often done on limited testimony, limited information, and it's still inequitable. Is it an affirmative defense, unclean hands, so you would bear the burden? Yes, of course. But again, it comes back to the point where Fetch brought this on themselves. They sued all of these franchisees together on one thing, insisted on doing it quickly, and the court recognized that it would not be possible to get all of these people in in three weeks' notice and do it that way. And it relied on precedent in this district and in the Sixth Circuit that understands that preliminary injunction motions are often heard on limited evidence, and it should be able to be decided based on that. I mean, that's just a practicality of the court. Do you think, I guess this case is only about a preliminary injunction because of the arbitration component to it. There's an arbitration here, and that's where those facts will be fleshed out. I'm just taking it to its logical conclusion. Do you think when it reaches the merits, you're still going to be able to rely on unclean hands, or do you think you'll have to prove that on a defendant-by-defendant basis? Oh, no, absolutely. At arbitration, that has to be proven on an individual basis. And if I could, I'd like to also touch on this first breach issue because I think that's another important one. And initially, I think Fetch's waiver argument fails because this isn't just a typical waiver argument. Fetch's conduct is not only a breach or a claim, it's a total repudiation of the contract, and it's also unlawful. They terminated these three legacy franchisees unlawfully in violation of each of their own state's franchise laws. And what Fetch ignores is that preliminary injunction still requires equity. So based on these terminations, you also have an unclean hands issue because that applies to fraud, deceit, unconscionability, or bad faith. And terminating franchisees who were not in breach is both a total breach violation of the law, which can only be unconscionable and bad faith. And I think it's important to remember that this maxim of unclean hands protects the integrity of the court itself, not just the rights of contracting parties. What's the best response, though, even if they were the first to breach to the waiver provision in the contract that it would not waive the non-compete provisions of the contract? Well, that's what I'm saying. It's still unclean hands. Do you think that parties can contract around unclean hands? No. And since we briefed this, I've actually found a case that's directly on point. The Mente Chevrolet Oldsmobile Incorporated v. GMAC, GMAC Incorporated, twice. It's 451 F Appendix 214 at 218, and that's Third Circuit 2011, and I'll quote, a request to enforce a contractual waiver is a request for specific performance of the contract containing the waiver. Specific performance is an equitable remedy and so can be barred by the doctrine of unclean hands. And what it's saying is equity answers to the court, not the contract. So you can't contract around the court's own ability to control its docket, to perform rule in equity. So even if the first to breach waiver is there and valid, I don't think it should be because they've repudiated that by terminating this contract unlawfully. But it still applies to the unclean hands, and an unlawful intermination is certainly rises to the level of unconscionability or bad faith that would support an unclean hands defense. And I think that was my time. Thank you. All right. Let me just ask if Judge Gibbons has any questions. Okay. Thank you. Thank you, Your Honors. Your Honors, let me address the factual finding with respect to our inability to recoup the clients that were lost as a result of the competition. We have direct testimony in the record. Greg Long testified in no uncertain terms. He had 12 franchisees ready, willing, and able to go into the lost markets and recoup clients. And I disagree, and it was testimony that was ignored by the lower court. So we'd have to find the district court's ruling factual finding clearly erroneous? I mean, we can do that. You would, especially if it does not address contrary evidence. And this is very direct contrary evidence. And I agree with Judge Gibbons when he talked about his efforts to secure the markets that these individuals were departing. On the first material breach analysis, this applies to the 1.0 fetch legacy franchisees. That's a clear and unequivocal waiver of the first material breach defense. And it makes sense that the Federal Trade Commission, when it attempted to ban non-competes, specifically accepted the franchise industry because non-competes were so critical to that industry, it would destroy the business model. And, you know, the franchise is an agreement based on trust. We give you our trademarks. We give you our brand. We give you the secret sauce on how to do this business. And in exchange, you agree that you will not compete for a reasonable period of time in a reasonable geographic area. And that's an important point here. There is absolutely no disagreement that this non-compete was reasonable in scope and in geographic scope and in length of time. Two years, 25 miles. Finally, I would like to address what Judge Murphy pointed out, which was that the court's misapprehension of performance unlimited taints its entire irreparable harm analysis. Loss of goodwill, loss of market share, that is classic, quintessential irreparable harm. And his manner and approach, it was as if the court below was attempting to thread through the eyes of a hundred needles in the manner in which it went about trying to justify the lack of injunctive relief here. And if you look at the analysis and if you look at the testimony that was disregarded, we brought a national expert on franchise law. The lower court did not mention his testimony at all. Not a part at all of the lower court's decision. Respectfully, Your Honor, I know I'm out of time, but I submit that this is an extraordinarily important case for the franchise industry. Non-competes are critical. And without the enforcement of non-competes, this industry falls. Thank you very much.